**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____
                                                            )
**UNITED STATES OF AMERICA,**             )
                                                            )
    **Plaintiff,**                                      )
                                                            )
        **v.**                                          )        **Criminal No. 15-188 (APM)**
                                                            )
**JAMES MARVIN REED,**                     )
                                                            )
    **Defendant.**                                  )
_____ )

## MEMORANDUM OPINION AND ORDER

      Defendant James Marvin Reed is charged in a two-count indictment that alleges he engaged in illicit sexual conduct with two different minors while in a foreign country.  In Count One, Defendant is charged with violating 18 U.S.C. § 2423(c), between January and December 2007, by traveling to the Philippines and exchanging money for sex with a minor child.  In Count Two, Defendant is charged with violating 18 U.S.C. §§ 2423(c) and 2423(e), between January and August 2016, by residing in the Philippines and molesting and attempting to molest his own minor child.

      Defendant moves the court to dismiss the indictment against him as unconstitutional for several reasons.  First, he claims that prosecuting him for a crime purportedly committed more than eight years prior to when he was formally charged constitutes impermissible pre-indictment delay.  Second, he argues that the law under which he is charged in Count Two was enacted after part of his alleged conduct took place, making it retroactive legislation that violates the Ex Post Facto Clause.  Third, Defendant submits that Congress did not have constitutional authority to enact 18 U.S.C. § 2423(c).  Fourth, he moves to sever the Counts and proceed with separate trials

if both Counts in the indictment are to stand. Lastly, Defendant asserts that the indictment must be dismissed because the District of Columbia is the wrong venue in which to try him.

After thorough review of the parties' submissions and applicable law, the court will allow trial to proceed on Count One of the indictment, but not on Count Two. As to Count One, the court concludes that Congress has authority under the Foreign Commerce Clause to criminalize the conduct alleged therein, and Defendant's Due Process Clause rights were not violated by the Government obtaining an indictment years after the events in question. As to Count Two, the court concludes that the charges do not violate the Ex Post Facto Clause, but will dismiss Count Two because Section 2423(c) is unconstitutional as applied to the conduct alleged. Congress does not possess authority under either the Foreign Commerce Clause or the Necessary and Proper Clause to criminalize Defendant's alleged act of sexually molesting and attempting to sexually molest his four-year-old daughter while residing in the Philippines. In light of that conclusion, the court denies Defendant's Motion to Sever as moot. The court also rejects, at this juncture, Defendant's challenge to venue in the District of Columbia.

## I.    BACKGROUND

When ruling on a motion to dismiss an indictment, the district court assumes the truth of the factual allegations in the indictment and the Government's proffered facts. *United States v. Ballestas*, 795 F.3d 138, 148–49 (D.C. Cir. 2015). Accordingly, in order to resolve the motions to dismiss presently before the court, the court accepts as true the following facts.

Defendant James Marvin Reed, a citizen of the United States, is a United States Navy veteran who has resided abroad for several years, with occasional trips to the United States. *See* Gov't's Resp. to Def.'s Mot. to Dismiss the Indictment, ECF No. 25 [hereinafter Gov't's Opp'n, ECF No. 25], at 2 & n.2, 5; Status Conf. Tr. (draft), May 5, 2017, at 9. In particular, Defendant

traveled to the Philippines from the United States in January 2007 and remained there until at least 2008. *See* Gov't's Opp'n, ECF No. 25, at 5. On December 15, 2015, a grand jury indicted Defendant on one count of traveling in foreign commerce and engaging in illicit sexual conduct with a minor child (Minor A), in violation of 18 U.S.C. § 2423(c) (2007). *See* Indictment, ECF No. 1; Arrest Warrant, ECF No. 9. The grand jury returned a Superseding Indictment on May 4, 2017. *See* Superseding Indictment, ECF No. 26. The new indictment repeats the original charge (Count One) and adds a second count against Defendant for residing in a foreign country and engaging and attempting to engage in illicit sexual conduct with a different minor victim (Minor B), in violation of 18 U.S.C. § 2423(c), (e) (2016) (Count Two). *See* Superseding Indictment, ECF No. 26.[1]

The original Indictment arose from a years-long investigation both in the Philippines and the United States. According to the Government, the department of Homeland Security Investigations ("HSI") in Manila, Philippines ("HSI Manila") first received information about the events giving rise to original Indictment in November 2008. *See* Gov't's Resp. to Def.'s Mot. to Dismiss Indictment Due to Pre-Indictment Delay, ECF No. 24 [hereinafter Gov't's Opp'n, ECF No. 24], at 1. HSI Manila began a covert operation to locate Defendant a few weeks later, but those efforts proved unsuccessful and investigative efforts waned when the original case agent

---

[1] Although Count One and Count Two both charge Defendant with violating 18 U.S.C. § 2423(c), the language in each count differs in light of the version of the statute in effect at the time of the conduct charged. In 2007, Section 2423(c) prohibited "[a]ny United States citizen . . . who travels in foreign commerce . . . [from] engag[ing] in any illicit sexual conduct with another person." 18 U.S.C. § 2423(c) (2007). In 2013, Congress amended Section 2423(c) to include, as an alternative element to "travel[ing] in foreign commerce," the element of "resid[ing] . . . in a foreign country." *See* Violence Against Women Reauthorization Act of 2013, Pub. L. No. 113-4, § 1211, 127 Stat. 54, 142 (2013) (codified as amended at 18 U.S.C. § 2423). Thus, since 2013, Section 2423(c) has made it unlawful for "[a]ny United States citizen . . . who travels in foreign commerce or resides, either temporarily or permanently, in a foreign country" to "engage[] in any illicit sexual conduct with another person." 18 U.S.C. § 2423(c). Because Count One concerns conduct that occurred before 2013, it charges Defendant under the prior version of Section 2423(c). Count Two, by contrast, charges Defendant under the current version of Section 2323(c) for conduct that allegedly occurred in 2016.

retired between 2010 and 2012. *See id.* at 2. In November 2012, after learning the case remained open, HSI agents in Manila and Washington, D.C., re-interviewed Minor A and began actively pursuing Defendant again. *Id.* Initial efforts to obtain Defendant's DNA from the United States military and when he passed through airport security in San Francisco, California, in December 2012, proved unsuccessful. *Id.*[2] In the early months of 2013, the Government subpoenaed Camber Corporation—believed to be Defendant's former employer—as well as Citibank and Delta Airlines to provide materials to a grand jury. *Id.* at 3. In late 2013, investigators successfully obtained DNA samples from Minor A and her child. *Id.* In April 2014, the Government requested statistical records of live births in the Philippines from the Government of the Philippines, which produced those records in September 2015. *Id.* Also in 2014, HSI pursued a lead in Guam, believing Defendant might be living there, and made a summons request to Facebook in a further attempt to locate Defendant. *Id.* Investigators were only able to determine Defendant's general location in 2015, after they identified the internet protocol address affiliated with his e-mail account, which placed him in the Philippines. *Id.* Defendant was taken into custody in the Philippines in August 2016, at which point he provided HSI Manila agents with a DNA sample and his address in Butuan, Philippines. *Id.* at 4. He was deported to the United States in September 2016. *Id.*

The Government asserts that the evidence pertaining to Count One will show that Defendant traveled from the United States to the Philippines and subsequently engaged in a commercial, sexual relationship with Minor A. *See* Gov't's Opp'n, ECF No. 25, at 5–6. According to the Government, on January 17, 2007, Defendant boarded a flight in Hartford, Connecticut, to

---

[2] Investigators mistakenly believed Defendant was a retired member of the United States Army, rather than the United States Navy, thus making their request for a DNA sample from the Army unproductive. *See* Gov't's Opp'n, ECF No. 24, at 2 & n.2.

Minneapolis, Minnesota; traveled onward to Narita, Japan; and reached his final destination—Manila, Philippines—on January 18, 2007. *Id.* at 5. In September 2007, while in the Philippines, a mutual acquaintance introduced Defendant to Minor A and told Defendant that Minor A was 15 years old (though, in reality, she was 14 years old). *Id.* Defendant gave Minor A his business card and, a few days later, invited her to his residence at the Castle Peak Tower condominium complex, in Cebu City, Philippines. *Id.* Minor A visited Defendant at his home approximately ten times between September and December 2007 and engaged in sexual intercourse with Defendant during each visit. *Id.* at 5–6. The first time Minor A visited Defendant at his residence, Defendant gave her a glass of wine, took nude photographs of her, engaged in sexual intercourse with her, and offered her 2,000 pesos and to pay for her school expenses. *Id.* at 6. On each visit that followed, Defendant paid Minor A 1,000 pesos. *Id.* Minor A gave birth to a child the following year, when she was 15 years old. *Id.* According to DNA testing, there is a 99.9999% probability that Defendant is the father of Minor A's child. Gov't Opp'n, ECF No. 24, at 4.

With respect to Count Two, the Government submits that its evidence will show Defendant resided in the Philippines in 2016 and sexually assaulted his four-year-old daughter, Minor B. *See* Gov't Surreply, ECF No. 37, at 2; Status Conf. Tr. (draft), May 5, 2017, at 4 (explaining that Defendant is biologically related to Minor B); Hr'g Tr. (draft), June 15, 2017, at 20.[3] The Government proffers that from January to August 2016, Minor B was in Defendant's care, control, and custody in the Philippines and, during those periods of custody, Defendant contacted and attempted to contact his penis with Minor B's vulva, as well as digitally penetrated Minor B's vaginal opening. Gov't Opp'n to Def.'s Mot. to Sever, ECF No. 36 [hereinafter Gov't Opp'n,

---

[3] The Government has represented that there is no biological relationship between Minor A and Minor B. *See* Status Conf. Tr. (draft), May 5, 2017, at 8.

ECF No. 36], at 3; Gov't's Surreply, ECF No. 37, at 2.  Minor B eventually disclosed Defendant's conduct to her mother and grandmother.  Gov't Opp'n, ECF No. 36, at 3.

## II.    DISCUSSION

Defendant has moved to dismiss the Superseding Indictment on the grounds that (1) Count One violates his rights under the Fifth Amendment's Due Process Clause because the Government waited more than eight years to prosecute him; (2) Count Two violates his rights under the Ex Post Facto Clause because it retroactively criminalizes his lawful residency in the Philippines; and (3) both Counts allege violations of a statutory provision, 18 U.S.C. § 2423(c), that Congress lacked constitutional authority to enact.  *See* Def.'s Mot. to Dismiss Indictment Due to Pre-Indictment Delay, ECF No. 18 [hereinafter Def.'s Mot. to Dismiss, ECF No. 18]; Def.'s Mot. to Dismiss Indictment, ECF No. 19 [hereinafter Def.'s Mot. to Dismiss, ECF No. 19].  With respect to the last argument, Defendant challenges the constitutionality of the statute both on its face and as applied to the allegations against him.  Hr'g Tr. (draft), June 15, 2017, at 4.  He asserts that Congress can rely upon neither the Commerce Clause nor the Necessary and Proper Clause to create the criminal offenses with which he is charged.  *See* Def.'s Mot. to Dismiss, ECF No. 19, at 6–11; Def.'s Reply in Supp. of Mot. to Dismiss Indictment & Def.'s Mot. to Dismiss Superseding Indictment, ECF No. 29 [hereinafter Def.'s Reply, ECF No. 29], at 7–16.  In the event the court finds both Counts rest on constitutional applications of Section 2423(c), Defendant moves to sever the charges and proceed in two separate trials.  *See* Def.'s Mot. to Sever, ECF No. 34.  Finally, Defendant urges the court to dismiss the Superseding Indictment in its entirety because venue is not proper in the District of Columbia.

The court addresses each argument in turn.

### A.    Pre-Indictment Delay

Defendant first moves to dismiss Count One of the Superseding Indictment on the ground that the United States violated his due process rights by waiting until December 2015 to file charges against him for conduct that allegedly occurred in 2007. *See* Def.'s Mot. to Dismiss, ECF No. 18.

The statutory period of limitations and the Due Process Clause of the Constitution guard against the imposition of stale charges against a criminal defendant. *United States v. Lovasco*, 431 U.S. 783, 789 (1977); *United States v. Marion*, 404 U.S. 307, 322–23 (1971). While a defendant's primary protection against a delayed prosecution is the limitations period, a defendant can show that a pre-indictment delay that does not violate the statute of limitations nonetheless violates his rights under the Due Process Clause by demonstrating that the delay (1) substantially prejudiced his right to a fair trial and (2) was used to gain tactical advantage over him. *Marion*, 404 U.S. at 324; *accord United States v. Bridgeman*, 523 F.2d 1099, 1111–12 (D.C. Cir. 1975); *see United States v. Kilroy*, 769 F. Supp. 6, 7 (D.D.C. 1991) (explaining that the defendant bears the burden of demonstrating both elements), *aff'd on other ground*, 27 F.3d 679 (D.C. Cir. 1994). A prosecutor's decision to delay indictment in order to investigate further does not offend the Constitution. *Lovasco*, 431 U.S. at 790, 796. Instead, the defendant must demonstrate that delay was a "deliberate prosecution tactic." *Bridgeman*, 523 F.2d at 1112.

Defendant contends that the eight-year period between the conduct alleged in Count One and the charges brought against him has prejudiced his ability to defend himself in this case because a substantial number of witnesses are now unavailable, and those that are available have faded memories. Specifically, Defendant notes that two restaurants in which he and Minor A purportedly were seen together have now closed and, as a result, their former employees and

patrons are unavailable to aid in his defense.  Def.'s Mot. to Dismiss, ECF No. 18, at 3.  Similarly, in light of the substantial gap in time between the alleged conduct and return of the original Indictment, the employees and residents of the Castle Peak Tower condominium complex are no longer available to be interviewed.  *Id.*  Additionally, Defendant states that discovery revealed that his driver has "first hand knowledge of the alleged conduct," but Defendant cannot locate the driver for an interview in light of the passage of time.  *Id.* at 3–4.  Lastly, Defendant notes that the few witnesses he has been able to locate and contact can only provide diminished assistance because the lapse in time since the alleged events has affected their memories.  *Id.* at 4.  Collectively, Defendant concludes, the pre-indictment delay fatally undermines his ability to put on an effective defense.

Defendant has failed to establish both the substantial prejudice and government misconduct necessary to prove that pre-indictment delay violated his due process rights.  Although Defendant points to some prejudice resulting from the delay between the events alleged and return of the original Indictment, that prejudice falls short of constituting "substantial prejudice."  *See Marion*, 404 U.S. at 324.  Defendant makes generalized statements about prejudice stemming from witnesses' loss of memory over time and only speculates that unavailable witnesses would be able to contribute to his defense, rather than make a specific claim that any one witness could offer exculpatory evidence.  *See United States v. Brodie*, 326 F. Supp. 2d 83, 88 (D.D.C. 2004); *Kilroy*, 769 F. Supp. at 8.  Additionally, Defendant has made no effort to demonstrate that the Government intentionally delayed seeking an indictment in order to gain a tactical advantage in his prosecution.  On the record presented, the court sees no evidence of strategic intent on the part of the Government.  The Government represents that it first learned of the conduct giving rise to the charge in Count One a year after it allegedly occurred and that there

was insufficient or incomplete evidence at that time to pursue criminal charges.  *See* Gov't's Opp'n, ECF No. 24, at 1–2 (explaining inability to locate Defendant).  Although the Government could have been more diligent in pursuing the case despite changes in personnel, *cf. id.* at 3, that delay does not evidence bad faith.  Indeed, the fact that the Government did not believe it had enough evidence to indict Defendant in 2008, or even 2014, and needed to investigate further reflects appropriate prosecutorial restraint, not an effort to take tactical advantage of Defendant.

Accordingly, the court concludes Defendant did not suffer a violation of his rights under the Due Process Clause due to pre-indictment delay.

### B.    Ex Post Facto Clause

Defendant next moves to dismiss Count Two of the Superseding Indictment on the ground that Section 2423(c), as applied to the conduct alleged in that Count, violates his constitutional right to be free from retroactive legislation.  Def.'s Reply, ECF No. 29, at 18–19.  Count Two alleges: "Between on or about January 3, 2016, and on or about August 2, 2016, [Defendant] . . . did reside, temporarily and permanently, in the Philippines, a foreign country, and engage and attempt to engage in illicit sexual conduct . . . with another person under 18 years of age (MINOR B)."  Superseding Indictment, ECF No. 26, at 2.  Defendant submits that he has "resided" in the Philippines since long before 2013, when Congress amended Section 2423(c) to include, as an alternative element to "travel[] in foreign commerce," the act of "resid[ing], either temporarily or permanently, in a foreign country."  *See* Def.'s Reply, ECF No. 29, at 19; *see also* Violence Against Women Reauthorization Act of 2013, Pub. L. No. 113-4, § 1211, 127 Stat. 54, 142 (2013) (codified as amended at 18 U.S.C. § 2423); *supra*, at note 1.  Consequently, Defendant concludes, to file charges against him in 2016 for a crime that depends on lawful conduct occurring prior to 2013—his residency in the Philippines—violates the Ex Post Facto Clause.  *See* Def.'s Reply, ECF

No. 29, at 19.

The Constitution prohibits Congress from passing any "ex post facto Law," U.S. CONST. art. I, § 9, cl. 3, which means, in part, that Congress may not punish an individual for committing an act that, at the time, was lawful to commit, *Calder v. Bull*, 3 U.S. (3 Dall.) 386, 390 (1798); *Al Bahlul v. United States*, 767 F.3d 1, 17–18 (D.C. Cir. 2014) (en banc).  The court assesses whether a statute violates the Ex Post Facto Clause by determining if the statute "attach[es] new legal consequences to events completed before its enactment." *Bartko v. SEC*, 845 F.3d 1217, 1223 (D.C. Cir. 2017).  "New legal consequences" include (1) "impair[ment] [of] rights a party possessed when he acted"; (2) "increase[] [of] a party's liability for past conduct"; (3) "impos[ition] [of] new duties with respect to transactions already completed"; or (4) "material adjustments to the extent of a party's liability."  *Id.* (internal quotation marks omitted).  However, "[a] statute is not made retroactive merely because it draws upon antecedent facts for its operation." *Cox v. Hart*, 260 U.S. 427, 435 (1922); *accord United States v. Hemmings*, 258 F.3d 587, 594 (7th Cir. 2001) (applying *Cox*, 260 U.S. 427, to the Ex Post Facto Clause).

Section 2423(c) does not qualify as an ex post facto law, as applied in Count Two, because the crime alleged did not occur until January 2016, *after* Congress amended the statute.  The charges in Count Two require the Government to prove two elements: (1) residency in a foreign country; and (2) engaging or attempting to engage in noncommercial sexual conduct with a minor.  18 U.S.C. § 2423(c), (e), (f)(1).  Both elements occurred simultaneously in January 2016 when Defendant (1) was residing in the Philippines and (2) allegedly engaged or attempted to engage in a sexual act with his minor daughter.  It follows, then, that the law does not criminalize Defendant's act of residing in the Philippines prior to the alleged molestation in 2016.  Rather, it criminalizes

the act of molesting a child *while* residing in the Philippines.  Defendant's residence in the Philippines in 2013 is irrelevant to Count Two and, thus, poses no ex post facto concern.

Therefore, the court rejects Defendant's challenge to the constitutionality of Count Two based on the Ex Post Facto Clause.

### C.    Constitutionality of Counts One and Two

The heart of Defendant's Motion is that both Counts of the Superseding Indictment are unconstitutional because Congress did not have power to pass the statutory provision upon which they rest:  Section 2423(c).  Under Rule 12 of the Federal Rules of Criminal Procedure, the defendant in a criminal matter may challenge his or her indictment as unconstitutional at any point prior to trial.  *See* Fed. R. Crim. P. 12(b)(3).  In making such a challenge, the defendant may seek to invalidate the indictment as unconstitutional on its face or as applied to the conduct alleged.  For the court to hold that a statute is facially unconstitutional, the defendant bears the heavy burden of demonstrating that "no set of circumstances exists under which the [statute] would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987).  In contrast, to succeed on an as-applied challenge, the defendant need only show that the statute is "an unconstitutional exercise of congressional power" as applied to the conduct set forth in the indictment.  *United States v. Sullivan*, 451 F.3d 884, 887 (D.C. Cir. 2006).  Here, Defendant brings both facial and as-applied challenges to each Count in the Superseding Indictment.

To justify a piece of legislation, the Government must be able to point to an enumerated power in the Constitution that authorized Congress to enact it.  It is beyond doubt that, "lacking a police power, 'Congress cannot punish felonies generally.'  A criminal act committed wholly within a State 'cannot be made an offence against the United States, unless it [has] some relation to the execution of a power of Congress, or to some matter within the jurisdiction of the United

States.'"  *United States v. Bond*, 572 U.S. ___, ___, 134 S. Ct. 2077, 2086 (2014) (quoting *Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 428 (1821); *United States v. Fox*, 95 U.S. 670, 672 (1878)). Here, the question is not whether Congress has the authority to criminalize conduct occurring wholly within one of the United States, but, relatedly, whether acts occurring wholly within a foreign country can be made "an offence against the United States" pursuant to one of Congress' enumerated powers.

The Government asserts that Section 2423(c) is a constitutional exercise of Congress' authority to regulate international commercial activities under the Foreign Commerce Clause and its power to enact legislation that implements a non-self-executing treaty under the Necessary and Proper Clause.  First, the Government explains that Section 2423(c), defined to reach either commercial or noncommercial sex acts with children, is a constitutional exercise of Congress' Foreign Commerce Clause power because it regulates conduct linked to a broad, international market in child trafficking and sex tourism.  Gov't's Surreply, ECF No. 37, at 10–11.  As a general matter, the Government submits that Congress possesses broader authority to regulate its citizens' conduct abroad than their activities at home.  *See* Gov't's Opp'n, ECF No. 25, at 10.  To the extent the Interstate Commerce Clause's familiar framework provides a helpful analytical tool, the Government contends that it represents a floor, rather than a ceiling, on Congress' power under the Foreign Commerce Clause.  *See id.* at 11.  The Government believes Section 2423(c) to be a constitutional exercise of Congress' power on the ground that Congress had a rational basis to conclude having sex with minors, irrespective of whether money is exchanged, is part of a class of activities that has a substantial effect on the trafficking of children and sex tourism—commercial markets in which Americans participate—and failing to regulate that conduct would leave a large "gap" in Congress' overarching regulatory scheme.  *See id.* at 15–16; Gov't's Surreply, ECF No.

37, at 10–11.  Second, and separately, the Government submits that the court may uphold Section 2423(c) as a proper exercise of Congress' authority under the Necessary and Proper Clause to pass legislation that implements a non-self-executing treaty to which the United States is a party: the Optional Protocol to the Convention on the Rights of the Child on the Sale of Children, Child Prostitution and Child Pornography ("the Optional Protocol"), *adopted* May 25, 2000, T.I.A.S. No. 13,095, 2171 U.N.T.S. 227 [hereinafter OPTIONAL PROTOCOL].  *See* Gov't's Opp'n, ECF No. 25, at 20; Gov't's Surreply, ECF No. 37, at 12–13; *see also* S. TREATY DOC. 106-37 (2000). Whether defined to reach commercial or noncommercial sexual abuse of children, the Government contends, Section 2423(c) is rationally related to the Optional Protocol's broad interest in eliminating sexual harm of children and, therefore, should be upheld as constitutional implementing legislation.  Gov't's Surreply, ECF No. 37, at 12–13.

Defendant challenges Section 2423(c) as unsupported by either power of Congress.  First, Defendant submits that, to the extent Congress possesses broader authority to regulate its citizens' conduct under the Foreign Commerce Clause than under the Interstate Commerce Clause, the Foreign Commerce Clause is not an absolute, world-wide police power.  *See* Def.'s Mot. to Dismiss, ECF No. 19, at 4.  Consequently, Defendant views the Interstate Commerce Clause's outer bounds as representative of the scope of the Foreign Commerce Clause.  Analyzing Section 2423(c) under the Interstate Commerce Clause framework, Defendant asserts that Section 2423(c)'s commercial application—at issue in Count One—cannot survive because it touches neither a channel nor instrumentality of commerce, and "local, intra-national activity unconnected to travel in foreign commerce" is beyond Congress' power to regulate.  *Id.* at 8, 10–11.  Further, even if Congress can reach local foreign activity that substantially affects foreign commerce, Congress' authority cannot be construed so broadly as to allow it to "create comprehensive global

regulatory schemes among the nations of the world." *Id.*  With respect to Section 2423(c)'s noncommercial application—at issue in Count Two—Defendant asserts that Congress may not regulate noncommercial conduct based on the effect it might, through a series of inferences, have on foreign commerce.  Def.'s Reply, ECF No. 29, at 8–9.  And, Defendant claims, Section 2423(c)'s noncommercial application does not fill a gap in a broader regulatory scheme designed to stop child sex trafficking because the only conduct that provision regulates is a local crime that is inherently noneconomic in nature.  *See id.* at 10–11.  Second, as to the Necessary and Proper Clause, Defendant pushes back against the Government's theory that Section 2423(c) implements the Optional Protocol on the grounds that the statute is not implementing legislation, it proscribes conduct not mentioned in the treaty, and it is unrelated to the treaty's objective of preventing child trafficking and sex tourism.  *See id.* at 12–16.

Defendant's challenge to Section 2423(c) implicates complicated questions of constitutional law.  The court begins with his claim that Congress lacks authority under the Foreign Commerce Clause to pass Section 2423(c), as applied in Count One and Count Two.  That inquiry first requires the court to determine the framework that governs such an analysis before it can assess whether Section 2423(c)'s commercial and noncommercial applications are constitutional, as applied to the conduct alleged in each Count.  For the reasons that follow, the court concludes Congress can rely on the Foreign Commerce Clause to enact Section 2423(c)'s commercial application, as relevant to Count One, but not Section 2423(c)'s noncommercial application, as relevant to Count Two.  Accordingly, the court then turns to whether Section 2423(c)'s noncommercial application may be considered a constitutional exercise of Congress' authority under the Necessary and Proper Clause to implement the Optional Protocol.

### 1.    Foreign Commerce Clause

Article I of the United States Constitution authorizes Congress "[t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." U.S. CONST. art. I, § 8, cl. 3. The Supreme Court's interpretation of Congress' Commerce Power has developed through reference to the three sub-clauses within the Clause—the Foreign Commerce Clause, the Interstate Commerce Clause, and the Indian Commerce Clause—such that each occupies a distinct jurisprudential space in case law. *Cherokee Nation v. Georgia*, 30 U.S. (5 Pet.) 1, 18 (1831) (noting that "[t]he objects, to which the power of regulating commerce might be directed, are divided into three distinct classes . . . . [and] [w]hen forming this article, the convention considered them as entirely distinct"); *accord Cotton Petroleum Corp. v. New Mexico*, 490 U.S. 163, 191–92 (1989) (explaining that the Tribes and States cannot be treated interchangeably for purposes of determining Congress' regulatory authority under the Commerce Clause because each triggers different structural considerations within our constitutional system); *United States v. Pendleton*, 658 F.3d 299, 306–07 (3d Cir. 2011) (surveying the evolution of the Commerce Power over time); *United States v. Clark*, 435 F.3d 1100, 1110–13 (9th Cir. 2006) (same). The scope of Congress' power under the Foreign Commerce Clause—"[t]o regulate Commerce with foreign Nations"—is at issue here.

### a.    The Applicable Framework

Although a significant amount of ink has been spilled defining the contours of the Interstate Commerce Clause, the Supreme Court has yet to affirmatively state the scope of Congress' authority under the Foreign Commerce Clause. There are a few guideposts. The Court has noted that the Foreign Commerce Clause grants Congress at least the same authority as it possesses under the Indian Commerce Clause, *Buttfield v. Stranahan*, 192 U.S. 470, 492–93 (1904), which provides

Congress with "plenary and exclusive" power to regulate all things pertaining to the Native American tribes, *United States v. Lara*, 541 U.S. 193, 200 (2004). Additionally, the Court has suggested that the federalism and State sovereignty concerns that it confronts when it regulates interstate commerce do not constrain Congress in the same way when it acts to regulate international commercial activity. *See Japan Line, Ltd. v. County of Los Angeles*, 441 U.S. 434, 448 n.13 (1979). Supreme Court dicta also indicates that, in the absence of those constraints, the Foreign Commerce Clause defines a power that "may be" broader than that granted under the Interstate Commerce Clause. *See, e.g.*, *Atl. Cleaners & Dryers, Inc. v. United States*, 286 U.S. 427, 434 (1932); *Russell Motor Car Co. v. United States*, 261 U.S. 514, 521 (1923); *United States v. Knowles*, 197 F. Supp. 3d 143, 154 (D.D.C. 2016) (explaining that the Supreme Court "has indicated that the foreign commerce power is at least as broad as the power to regulate interstate commerce"). Lastly, the Court has developed an analytical framework for evaluating the negative implications of Congress' Foreign Commerce Clause power on a State's ability to tax instrumentalities of foreign commerce. In that context, the Court has grafted two additional "foreign commerce clause factors" onto the domestic framework for evaluating the validity of state taxes affecting interstate commerce: (1) "whether the tax, notwithstanding apportionment, creates a substantial risk of international multiple taxation"; and (2) "whether the tax prevents the Federal Government from speaking with one voice when regulating commercial relations with foreign governments." *Japan Line, Ltd.*, 441 U.S. at 451; *accord Itel Containers Int'l Corp. v. Huddleston*, 507 U.S. 60, 72 (1993).

The Foreign Commerce Clause must, like its counterparts, be subject to some limiting principles. As one federal appellate court has noted, "an unbounded reading of the Foreign Commerce Clause allows the Federal Government to intrude on the sovereignty of other

nations . . . . [and] on the liberty of individual citizens." *See United States v. Al-Maliki*, 787 F.3d 784, 793 (6th Cir. 2015). Moreover, it is a bold proposition to suggest the same word in the same Clause in our Constitution—"Commerce"—grants Congress unfettered authority to criminalize Americans' activities abroad that it restricts Congress from criminalizing at home. Some limits must exist.

Given the ambiguous contours of this constitutional power and the dearth of precedent in this jurisdiction, this court will look—as others have done—to the well-known Interstate Commerce Clause framework to analyze whether Section 2423(c) is a constitutional exercise of Congress' Commerce Power. *See, e.g.*, *Pendleton*, 658 F.3d at 308; *United States v. Bredimus*, 352 F.3d 200, 204–05 (5th Cir. 2003); *United States v. Homaune*, 898 F. Supp. 2d 153, 159–60 (D.D.C. 2012); *United States v. Martinez*, 599 F. Supp. 2d 784, 806 (W.D. Tex. 2009).

The court resorts to this existing analytical tool, even if imperfect, for three reasons. First, those cases in which the Supreme Court has intimated the Foreign Commerce Clause confers on Congress broader power than the Interstate Commerce Clause pertain to the scope of the *dormant* federal power to displace state taxes on instrumentalities of foreign commerce that interfere with the Nation's ability "to speak with one voice," *see, e.g.*, *Barclays Bank PLC v. Franchise Tax Bd. of Cal.*, 512 U.S. 298 (1994); *Japan Line, Ltd.*, 441 U.S. 434, and, therefore, do not speak to the scope of Congress' *affirmative* authority to enact legislation regulating foreign commerce. If we are to infer that these cases stand for a principle beyond their specific fact patterns, then it is that Congress' power to preempt state law in the realm of international commerce is broader than its power to do so domestically. Such a principle makes intuitive sense, given the Court's emphasis on the need for the United States "to speak with one voice" when interfacing with foreign countries. This court declines to stretch those cases beyond their shape to suggest they stand for

17

the related, yet significantly broader, proposition that Congress has greater constitutional authority to regulate its citizens' activities abroad than at home.

Second, this court is not certain that the Foreign Commerce Clause actually confers on Congress broader authority to regulate its citizens' activities abroad than the Interstate Commerce Clause allows it to regulate at home.  In the absence of binding precedent, this court could look solely to the text of the Commerce Power for guidance, and that text suggests a limited grant of power:  Congress can regulate commerce "with foreign Nations."  U.S. CONST. art. I, § 8, cl. 3.  At least one Supreme Court Justice agrees that, for purposes of interpreting the scope of Congress' Commerce Power, the word following "with" outlines the limits of the grant of constitutional authority.  Parsing the scope of Congress' authority to act pursuant to the Indian Commerce Clause, Justice Thomas has explained:

> Congress is given the power to regulate Commerce "with the Indian *tribes*."  The Clause does not give Congress the power to regulate commerce with all Indian *persons* any more than the Foreign Commerce Clause gives Congress the power to regulate commerce with all foreign nationals traveling within the United States.  A straightforward reading of the text, thus, confirms that Congress may only regulate commercial interactions—"commerce"—taking place with established Indian communities—"tribes."

*Adoptive Couple v. Baby Girl*, 570 U.S. ___, ___, 133 S. Ct. 2552, 2567 (2013) (Thomas, J., concurring).  Justice Thomas thus reads the Indian Commerce Clause to grant Congress authority only to regulate commerce between the United States and the Indian tribes, rather than between the United States and the individual members of the Indian tribes.  And, the mirror structures of the Indian Commerce Clause and Foreign Commerce Clause encourage complementary interpretations.  The Foreign Commerce Clause grants Congress authority to regulate the commercial interactions between the United States and another sovereign nation, rather than the power to reach into another sovereign country's territory and regulate the activities of American

18

citizens therein. *Baston v. United States*, 580 U.S. ___, ___, 137 S. Ct. 850, 853 (2017) (Thomas, J., dissenting from denial of certiorari); *see Clark*, 435 F.3d at 1117 (Ferguson, J., dissenting); *cf.* Anthony J. Colangelo, *The Foreign Commerce Clause*, 96 VA. L. REV. 949, 970–83 (2010).  Even if the Clause can be read to allow Congress to reach the extraterritorial acts of American citizens that occur wholly within a foreign country, Congress' authority has to be limited by consideration of the foreign Nation's sovereignty, in the same way that considerations of State sovereignty must be balanced against exercises of federal power under the Interstate Commerce Clause.  Given the fact that a foreign Nation's sovereignty is at least as broad as that of a State in the United States, this court is uncertain whether the affirmative power Congress wields under the Foreign Commerce Clause is necessarily broader than its power under the Interstate Commerce Clause.

Third, this court declines, in the present setting, to modify the Interstate Commerce Framework for purposes of an analysis under the Foreign Commerce Clause absent any guidance from the Supreme Court or the D.C. Circuit.  The fact that the Supreme Court has indicated Congress' power under the Foreign Commerce Clause "may be" broader than its power under the Interstate Commerce Clause is not enough for this court to concretely define the outer bounds of an enumerated power.  *Cf. Pendleton*, 658 F.3d at 308 (declining to decide whether the Foreign Commerce Clause conveys constitutional authority that is broader than the Interstate Commerce Clause absent guidance from the Supreme Court).  Admittedly, at least two other federal appellate courts have modified the Interstate Commerce Clause framework to address Foreign Commerce Clause issues.  *See United States v. Bollinger*, 798 F.3d 201, 215–16 (4th Cir. 2015) (modifying the Interstate Commerce Clause framework for use in the Foreign Commerce Clause context by loosening the requirement that intrastate activity have a "substantial effect" on commerce to require that it only have a "demonstrabl[e] effect" on commerce); *Clark*, 435 F.2d at 1113–14

(asking only whether the regulated activity "implicates foreign commerce to a constitutionally adequate degree"). This court elects not to follow those cases here. Moreover, for the reasons that follow, the court would reach the same holding today even if it were to apply those courts' modified frameworks.

Thus, the court tackles the constitutional question at hand by applying the well-defined Interstate Commerce Clause framework. Congress acts pursuant to its Interstate Commerce Power when it seeks to regulate activity that falls within one of the following categories: the channels of commerce; the instrumentalities of commerce; or local activity that, in the aggregate, has a substantial effect on interstate commerce. *United States v. Lopez*, 514 U.S. 549, 558–59 (1995). A piece of legislation that regulates the "channels" of commerce either facilitates or inhibits the movement of goods or people through interstate commerce. *E.g.*, *Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241, 256–57 (1964); *Nat'l Ass'n of Home Builders v. Babbitt*, 130 F.3d 1041, 1048 (D.C. Cir. 1997). Congress regulates the "instrumentalities" of commerce when it passes legislation that directs or inhibits the vehicles of economic activity—e.g., airplanes, steamships, automobiles, trains—or interstate means of communication—e.g., mail and wires. *E.g.*, *Hous. E. & W. Tex. Ry. v. United States*, 234 U.S. 342, 353–54 (1914); *Ickes v. FAA*, 299 F.3d 260, 263 (3d Cir. 2002) (per curiam). Lastly, Congress acts within the bounds of its constitutional authority when it regulates local activity that either is part of an economic "class of activities" Congress had a rational basis to believe has a substantial effect on interstate commerce or which it is necessary to regulate to avoid undercutting Congress' overarching regulation of economic activity. *Gonzales v. Raich*, 545 U.S. 1, 17–18, 22 (2005); *Sullivan*, 451 F.3d at 887–90. To determine whether an activity has a "substantial effect" on interstate commerce, the court considers the "four *Lopez* factors": (1) whether the activity itself "has anything to do with

commerce or any sort of economic enterprise, however broadly one might define those terms"; (2) "whether the statute in question contains an express jurisdictional element"; (3) "whether there are express congressional findings or legislative history regarding the effects upon interstate commerce of the regulated activity"; and (4) "whether the relationship between the regulated activity and interstate commerce is too attenuated to be regarded as substantial." *Rancho Viejo, LLC v. Norton*, 323 F.3d 1062, 1068–69 (D.C. Cir. 2003) (internal quotation marks omitted); *accord Miss. Comm'n on Envtl. Quality v. EPA*, 790 F.3d 138, 181–83 (D.C. Cir. 2015) (per curiam).

b.    Constitutionality of Count One under the Foreign Commerce Clause

Although the Government charged Defendant with two counts of violating 18 U.S.C. § 2423, that statute has been amended in the last decade and different versions apply to each Count.  The version of Section 2423(c) that applies to the conduct alleged in Count One makes it criminal for "[a]ny United States citizen" to "travel[] in foreign commerce[] and engage[] in any illicit sexual conduct with another person."  18 U.S.C. § 2423(c) (2007).[4]  "Illicit sexual conduct" is defined in two ways: (1) "a sexual act (as defined in section 2246) with a person under 18 years of age that would be in violation of chapter 109A if the sexual act occurred in the special maritime and territorial jurisdiction of the United States"[5]; or (2) "any commercial sex act (as

---

[4] Under that statutory provision, the Government is not required to prove that Defendant traveled in foreign commerce with the intent to engage in illicit sexual conduct.  Indeed, Section 2423(c) was enacted specifically to eliminate the mens rea requirement contained in subsection (b) because Congress thought it had become too difficult to prove that an individual traveled with a particular motive.  *See* H.R. REP. NO. 108-66, at 51–52 (2003) (Conf. Rep.).

[5] Section 2246, in turn, defines a "sexual act" as follows:

(A)  contact between the penis and the vulva or the penis and the anus, and for purposes of this subparagraph contact involving the penis occurs upon penetration, however slight;

(B)  contact between the mouth and the penis, the mouth and the vulva, or the mouth and the anus;

defined in Section 1591) with a person under 18 years of age."[6]  *Id.* § 2423(f) (2007).  For ease of reference, the court refers to the first definition as "noncommercial sex acts" and the second as "commercial sex acts."  The Government did not specify in the indictment which definition applies to Count One.  *See* Superseding Indictment, ECF No. 26, at 1.  However, the conduct alleged in that count reasonably implicates commercial sex acts, as the Government proffers that the evidence will prove Defendant paid Minor A each time they engaged in sexual intercourse at his apartment.[7]  Accordingly, the court must determine whether Congress has authority under the Foreign Commerce Clause to criminalize Defendant's alleged act of traveling to the Philippines and paying Minor A, then 14 years old, to have sex with him on ten separate occasions at his residence at the Castle Peak Tower condominium complex.

Several courts have held that Section 2423(c), coupled with the commercial definition of "illicit sexual conduct" found in subsection (f)(2), is a constitutional exercise of Congress' power under the Foreign Commerce Clause.  In fact, as far as this court can tell, every court to consider the issue has found the commercial application of the statutory provision to be within Congress'

---

(C) the penetration, however slight, of the anal or genital opening of another by a hand or finger or by any object, with an intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person; or

(D) the intentional touching, not through the clothing, of the genitalia of another person who has not attained the age of 16 years with an intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person[.]

18 U.S.C. § 2246(2).  This statutory section was not amended during the time period relevant to this case.

[6] Section 1591, in turn, defines a "commercial sex act" as "any sex act, on account of which anything of value is given to or received by any person."  18 U.S.C. § 1591(e)(3).  Although that statutory section has been amended during the time period relevant to this case, the definition of "commercial sex act" has not changed.

[7] Although the Government also indicates its evidence will prove Defendant took nude photographs of Minor A on her first visit to his residence, *see* Gov't's Opp'n, ECF No. 25, at 5–6, the Government concedes that that conduct does not violate the version of Section 2423(c) in effect at the time it allegedly occurred.  Section 2423 was not amended to include "production of child pornography" as a definition of "illicit sexual conduct" until May 2015.  *See* Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22, § 111(a), 129 Stat. 227, 240 (2015) (codified as amended at 18 U.S.C. § 2423).

authority to enact, although those courts offer different justifications for their holdings. A panel of judges on the Ninth and Third Circuits adopted a new standard under which they held Section 2423(c)'s commercial application to be constitutional. *See Clark*, 435 F.3d at 1109–17 (developing a Foreign Commerce Clause test that inquires whether the statute at issue "implicates foreign commerce to a constitutionally adequate degree" and holding that the commercial application of Section 2423(c) is constitutional under that test); *United States v. Bianchi*, 386 F. App'x 156, 161–62 (3d Cir. 2010) (adopting the Ninth Circuit's Foreign Commerce Clause framework and holding the commercial application of Section 2423(c) to be constitutional). Moreover, the District Court for the Eastern District of Wisconsin held Section 2423(c)'s commercial application to be a proper regulation of the "channels" of foreign commerce. *See United States v. Flath*, 845 F. Supp. 2d 951, 956 (E.D. Wis. 2012).

In contrast to those courts, this court concludes that Section 2423(c), as applied to the conduct alleged in Count One, is a constitutional exercise of Congress' Commerce Power because Congress had a rational basis to believe that Defendant's act of traveling to the Philippines and paying Minor A for sex substantially affects the international market in child trafficking and sex tourism, when such acts are considered in the aggregate. *See* 18 U.S.C. § 2423(c) (2007); *Raich*, 545 U.S. at 22; Gov't's Opp'n, ECF No. 25, at 10–19.

Section 2423(c), as applied to the conduct alleged in Count One, easily satisfies the first three *Lopez* factors. There can be no doubt that Section 2423(c), when coupled with the "commercial sex acts" definition contained in subsection (f)(2), regulates an economic activity. As the Supreme Court has explained, "'[e]conomics' refers to the production, distribution, and consumption of commodities." *Raich*, 545 U.S. at 25 (internal quotation marks omitted). In connection with passing the legislation subsequently codified at Section 2423(c), Congress made

factual findings that there exists a global marketplace for sexual exploitation of children, in which children are trafficked across borders for the purpose of prostitution, pornography production, and other forms of sexual abuse, and in which Americans are participating as customers. *See* H.R. REP. NO. 108-66, at 51–52 (2003) (Conf. Rep.); H.R. REP. NO. 107-525, at 2–3 (2002); *see also Martinez*, 599 F. Supp. 2d at 807–08. In that marketplace, the act of engaging in sexual intercourse with a child is the "commodity" for sale. In its simplest terms, Section 2423(c) prohibits the exchange of a thing of value for a particular commodity—a quintessential regulation of economic activity. Additionally, Section 2423(c) contains an express jurisdictional element. Congress seeks to regulate, in relevant part, its citizens' activities of engaging in commercial sex acts with minors in a foreign country and explicitly links that conduct to international commerce by making "travel[] in foreign commerce" an element of the offense. *See* 18 U.S.C. § 2423(c) (2007).[8]

As to the fourth *Lopez* factor, the conduct Section 2423(c)'s commercial application seeks to regulate is not so attenuated from the international market in child trafficking and sex tourism as to push it beyond Congress' reach. The basic principles of supply and demand, when applied to this conduct in the aggregate, make the court's conclusion self-evident. *See Raich*, 545 U.S. at 17, 22. Demand affects price: if sufficient numbers of American customers enter the marketplace for sex with children, their presence will effect an increase in price for illicit sexual activity with children. Increased price, in turn, affects supply. The trafficking of children both within individual

---

[8] Admittedly, this is a weak link to international commerce. Nearly all cases in which the latter element is proven— committing the commercial sexual act in a foreign country with a minor—necessitates the former element, i.e., Americans who commit commercial sex acts with minors in a foreign country had to cross a border to get to that country. Indeed, the only American citizens who could avoid prosecution would be those born to an American parent in the country where they engaged in the commercial sexual act and who never left the country, such that they never "travel[ed] in foreign commerce." *See also United States v. Jackson*, 480 F.3d 1014, 1024 (9th Cir. 2007) (holding that individual who traveled abroad prior to Section 2423(c)'s enactment and did not travel again could not be prosecuted); *cf. United States v. Stokes*, 726 F.3d 880, 888 (7th Cir. 2013) (citing *Jackson*, 480 F.3d 1014, with approval). Consequently, the limiting principle that the Supreme Court envisioned an "express jurisdictional element" might have on the scope of Congress' Commerce Power proves of limited effect in the present case. *Cf. United States v. Morrison*, 529 U.S. 598, 611–12 (2000) (quoting and discussing *Lopez*, 514 U.S. at 562).

countries and across international borders is likely to increase as the financial return on sex with children grows and remains lucrative; so, too, will the number of children who voluntarily enter the market, particularly in poorer countries. Moreover, that the substantive conduct at issue here— paying for sex with a child—occurred in a single, foreign locale does not place it beyond Congress' power. The Supreme Court has held that Congress can criminalize wholly intrastate possession of a commodity—for example, marijuana—because prohibiting intrastate possession of a commodity for which there is an interstate market "is a rational (and commonly utilized) means of regulating commerce in that product." *Raich*, 545 U.S. at 26. Section 2423(c), as defined to reach the conduct alleged in Count One, regulates the consumption of a "commodity"—sex acts with children—for which there is "an established . . . [international] market" by prohibiting individual acts of participation in that market. *See id.* Congress has the same power to prohibit traveling and engaging in commercial sex acts with children abroad as it does to prohibit intrastate possession and consumption of marijuana in the United States. With respect to both, there is a market Congress seeks to stamp out, and Congress may rely on its authority under the Commerce Power to do so. In light of these basic economic principles and Supreme Court precedent, it is clear that the conduct Section 2423(c)'s commercial application regulates is not so attenuated from the marketplace in child trafficking and sex tourism that Congress cannot regulate it.

In sum, the *Lopez* factors reflect that there is a rational basis for Congress to believe that traveling in foreign commerce and paying a minor child for sex, when considered in the aggregate, substantially affects foreign commerce. The court holds that Section 2423(c), insofar as it criminalizes Defendant's purported acts of traveling to the Philippines and paying Minor A for sex in 2007, is a constitutional exercise of Congress' authority under the Foreign Commerce Clause.[9]

---

[9] This ruling resolves one other argument raised by Defendant and obviates the need to consider multiple other arguments raised by the Government. Defendant also challenges Section 2423(c)'s commercial sex act prohibition as

> c.   Constitutionality of Count Two under the Foreign Commerce Clause

Count Two of the Superseding Indictment charges Defendant with violating both subsections (c) and (e) of Section 2423, as defined in subsection (f)(1), by contacting and attempting to contact his penis with his four-year-old daughter's vulva, as well as digitally penetrating his daughter's vaginal opening, while he resided in the Philippines in 2016. *See* Superseding Indictment, ECF No. 26, at 2; Gov't's Surreply, ECF No. 37, at 2.   The Government has proffered no facts connecting this alleged conduct to a commercial motive or exchange of a thing of value, leaving the court to assume the only motive was perverse sexual desire and gratification.   *Cf.* 18 U.S.C. § 1591(e)(3).   Accordingly, the court must determine whether Congress has authority under the Foreign Commerce Clause to criminalize Defendant's act of engaging and attempting to engage in a noncommercial sexual act with his daughter while residing in the Philippines.

The Government submits that Section 2423(c)'s prohibition on engaging in noncommercial sex acts with a minor child is a valid exercise of Congress' power under the Foreign Commerce Clause because noncommercial sex acts are part of a "class of activities" that Congress must be

---

facially invalid.  However, because the court concludes that Section 2423(c) is constitutional as applied to the alleged conduct in Count One, the court necessarily concludes that Section 2423(c)'s commercial sex act prohibition is facially constitutional.  *See Salerno*, 481 U.S. at 745 (explaining that a statute is only facially unconstitutional if there is no circumstance in which it is constitutional).  The Government argues that the court could find Section 2423(c) to be a constitutional exercise of Congress' power to regulate the "channels" of international commerce or its power to enact a law that implements a non-self-executing treaty.  *See* Gov't's Opp'n, ECF No. 25, at 20–24; Hr'g Tr. (draft), June 15, 2017, at 26.  The court need not reach either argument, however, in light of its conclusion that Section 2423(c) is a proper regulation of an economic activity that Congress had a rational basis to believe substantially affects an international commercial market.  Furthermore, because the court finds that Count One survives constitutional scrutiny insofar as it charges Defendant with traveling in foreign commerce and engaging in *commercial* sex acts with Minor A—and may go to the jury on that theory—the court need not consider whether Section 2423(c) also meets constitutional muster insofar as it charges Defendant with traveling in foreign commerce and engaging in *noncommercial* sex acts with Minor A.  The court need only take up that issue should the jury not credit the Government's evidence that something of value was given or received in connection with Defendant having sex with Minor A.

able to regulate in order to effectively stamp out American citizens' participation in child trafficking and sex tourism.[10] According to the Government, (1) child victims pursue prostitution as a result of the emotional harm their noncommercial sexual abuse causes, and (2) perpetrators use noncommercial sexual abuse to "groom" child victims to participate in subsequent acts of sexual abuse for commercial gain. Hr'g Tr. (draft), June 15, 2017, at 21–23. Thus, the Government believes noncommercial sexual abuse of children, in the aggregate, leads to an increase in the number of participants—both child victims and adult customers—in the market for child trafficking and sex tourism, thereby substantially affecting that market, and Congress' inability to reach that noncommercial conduct would cripple Congress' ability to stamp out the market. *See id.* at 28. For support, the Government points to *United States v. Martinez*, in which the District Court for the Western District of Texas concluded—in the context of Section 2423(c)'s prohibition on *traveling* and engaging in acts of noncommercial sexual abuse of children—that "leaving non-commercial sex with minors outside of federal control could affect the price for child prostitution services and other market conditions in the child prostitution industry" and would "leave a gaping hole in . . . [Congress'] ability to regulate the commercial industry of child prostitution." 599 F. Supp. 2d at 808 (internal quotation marks omitted). The Government urges this court to adopt the same reasoning.

The court cannot reach that result as applied to the facts of this case. For the reasons that

---

[10] At the hearing on this Motion, the Government suggested for the first time that Section 2423(c), as applied to noncommercial sex acts, also could be upheld as a valid exercise of Congress' ability to regulate the "instrumentalities" of international commerce. *See* Hr'g Tr. (draft), June 15, 2017, at 26–27. The Government's theory is that those who reside in foreign countries are only able to do so based on either a passport or visa; those passports and visas are "instrumentalities" of commerce; and, by restricting the activities of American citizens residing in foreign countries, Section 2423(c) regulates those citizens' visas and passports. *Id.* The Government confirmed at the hearing that it did not raise this argument in its brief. Accordingly, the court does not consider it.

Separately, although other federal courts have concluded that Section 2423(c)'s prohibition on noncommercial sex acts with minor children is a valid regulation of the "channels" of interstate commerce, *see Pendleton*, 658 F.3d at 311; *Flath*, 845 F. Supp. 2d at 956, the Government does not make that argument here, *see* Hr'g Tr. (draft), June 15, 2017, at 26. The court likewise does not take up that argument.

follow, the court concludes that there is no rational basis to believe Defendant's act of molesting and attempting to molest his daughter is part of an economic "class of activities" that substantially affects the international market for child trafficking and sex tourism. Additionally, the court concludes that Section 2423(c), as applied to reach the conduct alleged in Count Two, is not an "essential part" of Congress' broader efforts to eliminate that market, such that it is necessary and proper for Congress to regulate it.

None of the *Lopez* factors supports the conclusion that residing in a foreign country and molesting one's own child has a substantial effect on the international market for child trafficking and sex tourism. As to the first *Lopez* factor, the activity Congress seeks to regulate here— engaging in a "sexual act" with a child while residing in a foreign country—is not commercial in nature. "Sexual act"—as defined in Section 2423(f)(1) by cross-reference to Section 2246— involves the touching of certain parts of the defendant's body against certain parts of the victim's body. *See* 18 U.S.C. §§ 2246(2), 2423(f)(1). So defined, Section 2423(c) does not concern activity that is economic in nature. Defendant's purported act of molesting his daughter is "noneconomic, violent criminal conduct." *See United States v. Morrison*, 529 U.S. 598, 610–11, 617 (2000); *see also Lopez*, 514 U.S. at 561 (explaining that a law that made it a federal offense "for any individual knowingly to possess a firearm at a place that the individual knows, or has reasonable cause to believe, is a school zone" did not have anything "to do with 'commerce' or any sort of economic enterprise, however broadly one might define those terms").

Second, there is no "express jurisdictional element" connecting Section 2423(c)—as applied in this case—to foreign commerce. Defendant is charged with *residing in* the Philippines and molesting a minor child; he is not charged with "travel[ing] in foreign commerce." *See* 18 U.S.C. § 2423(c) (2016); Superseding Indictment, ECF No. 26, at 2. Residency in a foreign

country alone does not offer a jurisdictional element that allows the courts to "ensure, through case-by-case inquiry, that the [sexual abuse in question] affects [foreign] commerce." *See Lopez*, 514 U.S. at 561.

With respect to the third *Lopez* factor, Congress made no factual findings showing that *noncommercial* sexual violence committed by Americans residing abroad against children, generally, or biologically related children, in particular, has a substantial effect on foreign commerce. The legislative history of Section 2423(c) is devoid of *any* reference to the noncommercial molestation of children by American citizens residing in foreign countries, let alone references to such heinous behavior affecting international commerce. *See Al-Maliki*, 787 F.3d at 793 (discussing an absence of legislative findings linking noncommercial sexual abuse of children to the marketplace for sexual abuse of children and noting that "Congress' failure to even try to show the aggregate effect of noncommercial sexual activity on foreign commerce highlights its lack of power here").

Fourth, the link the Government wishes to draw between the noncommercial act of molesting one's own child while residing in a foreign country and the international market in child trafficking and sex tourism is too attenuated to rationally qualify as "substantial." The Government submits that noncommercial sexual abuse *could* lead victims of such abuse to become "commodities" for sale in the local market for commercial sexual abuse, and *if* they participate in that local market, then those same victims, in the aggregate, will affect the economics of the international market for child trafficking and sex tourism; and so, the original, noncommercial sexual abuse has a substantial effect on the international market in child trafficking and sex tourism. That rationale, however, is speculative and relies on the kind of weak chain of causation the Supreme Court has rejected. *See Morrison*, 529 U.S. at 615–17 (holding that Congress could

not rely on its Commerce Power to regulate gender-motivated violence on the theory that such violence deters interstate travel, suppresses interstate employment, reduces interstate transactions, and decreases national productivity because Congress may not "regulate noneconomic, violent criminal conduct based solely on that conduct's aggregate effect on interstate commerce"); *Lopez*, 514 U.S. at 563–67 (holding that Congress could not regulate mere possession of guns in school zones on the theory that possession of guns could lead to violent crime that, in turn, affects the national economy because a court may not "pile inference upon inference" in order to sustain a congressional action under the Commerce Clause); *see also Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 556–58 (2012) (Roberts, C.J.) (explaining that Congress could not use its Commerce Clause power to require the purchase of health insurance on the theory that every person, at some point, participates in the health care market because Congress cannot regulate economic activity that does not yet exist). This court is not free to sidestep those precedents and hold that Section 2423(c) is constitutional as applied to Defendant's alleged act of molesting his daughter while residing in the Philippines because, in the aggregate, the victims of such abuse might, perhaps, some day, become part of the marketplace Congress seeks to stamp out.[11]

Moreover, the court cannot conclude that an American citizen's act of sexually abusing his own child, without any evidence of commercial motive, is "an essential part" of Congress' broader

---

[11] Contrary to the Government's suggestion, *Martinez* is not an analogous or applicable case that helps this court determine the constitutionality of Count Two. First, the facts of *Martinez* present a picture of insidious conduct materially different from the one presently before the court. There, the defendant kidnapped a minor in Texas, took her across the border to Mexico, and then raped her in Mexico. *See* 599 F. Supp. 2d at 791–92. Here, in contrast, the court must consider Defendant's alleged act of molesting his daughter while living in the Philippines. Second, in light of the distinguishable facts before it, the *Martinez* Court only considered the constitutionality of Section 2423(c) as applied to a defendant who *travels* in foreign commerce and subsequently commits a noncommercial sex act; it had no occasion to consider the constitutionality of Section 2423(c) as applied to a defendant who commits a noncommercial act of sexual abuse while residing abroad. The court need not take the opportunity here to delve into whether there is a constitutional difference between the acts of "traveling" versus "residing" abroad: that *Martinez* involved a different construction of the statute than the one this court must analyze is enough to make it inapplicable to the present case.

efforts to stamp out American citizens' participation in the international market for child trafficking and sex tourism, such that it is "necessary and proper" for Congress to regulate that activity. *See Raich*, 545 U.S. at 17–18, 22, 24–25; *Lopez*, 514 U.S. at 561. By definition, the marketplace Congress seeks to eliminate depends on commerce and travel. Child sex tourists are those who "travel[] to a foreign country and engage in sexual activity with a child in that country." *See Extraterritorial Sexual Exploitation of Children*, DEP'T OF JUSTICE (Jan. 25, 2016), https://www.justice.gov/criminal-ceos/extraterritorial-sexual-exploitation-children. Similarly, child trafficking involves "recuit[ing] and transfer[ing] children across international borders in order to sexually exploit them in another country." *See Prostitution of Children*, DEP'T OF JUSTICE (June 3, 2015), https://www.justice.gov/criminal-ceos/prostitution-children. Section 2423's other subsections address these perpetrators' crimes by prohibiting the act of "knowingly transport[ing]" a minor in foreign commerce for the purpose of prostitution or criminal sexual activity and the act of traveling in foreign commerce "for the purpose of engaging in any illicit sexual conduct" with a minor. *See* 18 U.S.C. § 2423(a), (b). Section 2423(c), as applied to Defendant's alleged act of *residing* in the Philippines and sexually abusing Minor B, stands in stark contrast. Put simply, as alleged in Count Two, Defendant is neither a child sex tourist nor child trafficker. Understood in that way, a conviction under Count Two brings Congress no closer to stamping out the marketplace at which Section 2423's prohibitions are directed. Congress' broader regulatory effort does not depend on being able to criminalize the act of an American father who sexually abuses his own child and is not undermined by Congress' inability to reach that conduct.

In sum, none of the *Lopez* factors supports the conclusion that Congress may rely on its Commerce Power to criminalize Defendant's purported act of residing in the Philippines and sexually abusing or attempting to sexually abuse Minor B, and it is not necessary for Congress to

do so in order to eliminate the market in commercial exploitation of children.  Section 2423(c), as applied to the conduct alleged in Count Two, neither regulates commercial activity nor contains an express jurisdictional link to commerce. The Supreme Court has emphasized the role these two factors play in ensuring that the activity Congress seeks to regulate is tied in some manner to Congress' enumerated power to regulate commerce with foreign nations and among the several States.  *See Lopez*, 514 U.S. at 561; *see also Raich*, 545 U.S. at 23–24.  Though their absence is not fatal to the outcome, it is significant.  Additionally, there are no legislative findings linking noncommercial sexual abuse of children to effects on foreign commerce, and the court concludes any relationship that may exist is simply too attenuated for it to reasonably be considered "substantial."  The reasoning on which the Government relies involves stacking inferences to identify *potential* economic effects.  Lastly, Congress does not need to regulate this noncommercial, local conduct in order to effectuate its broader effort to eliminate the market in child trafficking and sex tourism; it is simply not an essential part of Section 2423's overarching regulatory scheme.

For those very reasons, the court would reach the same conclusion even if the court were to apply a modified Interstate Commerce Clause framework, as other Circuits have done, *see Bollinger*, 798 F.3d at 218–19; *Bianchi*, 386 F. App'x at 161–62; *Clark*, 435 F.3d at 1109–17, and as the Government urges the court to do here.  Relaxing the required nexus between commerce and the activity to be regulated does not affect the court's analysis in this case because there simply is no nexus between the act of an American citizen molesting and attempting to molest his daughter, without the exchange of anything of value to or from any person, while residing in the Philippines, and the market for child trafficking and sex tourism.  *See* 18 U.S.C. §§ 1591(e)(3), 2423(c), (f)(1), 2246; *Bianchi*, 386 F. App'x at 163 (Roth, J., concurring in part and dissenting in

part) (explaining that "there is no rational basis to conclude that an illicit sex act with a minor undertaken on foreign soil, perhaps years after legal travel and devoid of any exchange of value, substantially affects foreign commerce"). The activity charged in Count Two is an act of violence disconnected from foreign travel or commerce.

In the end, the court finds itself with no persuasive answer as to why Congress can criminalize quintessentially local conduct that occurs abroad when it lacks authority to criminalize that exact same conduct at home. The Government does not seriously dispute that, under *Morrison*, Congress cannot rely on its Commerce Power to criminalize wholly intrastate, familial sexual abuse. *Cf.* Hr'g Tr. (draft), June 15, 2017, at 24. The Government offers no satisfactory answer as to why the court should reach a different conclusion when the same act happens to occur abroad. This court is not prepared to conclude, without further persuasion or precedential guidance, that Congress can rely on its Foreign Commerce Clause power to regulate conduct it cannot reach under its Interstate Commerce Clause power simply because the conduct is perpetrated by someone who resides abroad. *Cf. Morrison*, 529 U.S. at 612.

In sum, the court holds that Section 2423(c), as applied to the conduct alleged in Count Two, is not a constitutional exercise of Congress' authority under the Foreign Commerce Clause.

2.     *Necessary and Proper Clause*

Next, the Government submits that the court may uphold Section 2423(c) as applied to the facts of this case as a proper exercise of Congress' authority under the Necessary and Proper Clause to pass legislation that implements the Optional Protocol to the Convention on the Rights of the Child on the Sale of Children, Child Prostitution and Child Pornography ("the Optional Protocol"), a non-self-executing treaty to which the United States is a party. This argument, too, raises complex questions of constitutional law. The court reviews the legal landscape governing the

33

relationship between the Necessary and Proper Clause, U.S. CONST. art. I, § 8, cl. 18, and Treaty Power, U.S. CONST. art. II, § 2, cl. 2, before analyzing whether Section 2423(c), as applied in Count Two of the Superseding Indictment, can be upheld as a constitutional implementation of the Optional Protocol.

a.    Congress' Power to Enact Implementing Legislation

The Constitution bestows on Congress the authority to effectuate treaties.  Although the President possesses the power to negotiate treaties on behalf of the United States, the Legislature determines whether the United States should ultimately join the treaty and whether it should do so with reservations.  The Senate must ratify a treaty before the United States becomes a party to it. U.S. CONST. art. II, § 2, cl. 2 ("[The President] shall have Power, by and with the Advice and Consent of the Senate, to make Treaties, provided two thirds of the Senators present concur."). The legal effect of ratification turns on the nature of the treaty itself and any reservations the Senate made.  If the Senate ratifies a self-executing treaty, then, upon ratification, the United States is both a party to the treaty and the treaty becomes federal law enforceable in the United States courts. *See Medellín v. Texas*, 552 U.S. 491, 504–05 (2008).  If the Senate ratifies a non-self-executing treaty, however, then ratification only makes the United States a party to the international agreement. *Id.* at 505.  For that type of treaty to become enforceable federal law, the Senate must pass additional legislation—known as "implementing legislation." *See id.* at 505–06, 525–26.

Congress' authority to enact implementing legislation has been established for nearly a century.  In *Missouri v. Holland*, the Supreme Court held that the Migratory Bird Treaty Act of 1918—a federal law that made a non-self-executing treaty between the United States and Great Britain binding on the States—did not unconstitutionally interfere with Missouri's rights under the Tenth Amendment.  252 U.S. 416 (1920).  Specifically, the Court explained that the Necessary

and Proper Clause provides Congress with authority to pass implementing legislation: "If the treaty is valid there can be no dispute about the validity of the statute under Article 1, Section 8, as a necessary and proper means to execute the powers of the Government." *Id.* at 432. The Migratory Bird Treaty Act of 1918 was a constitutional exercise of Congress' authority under that Clause because the problem at hand—deprivation of a food supply and destruction of forests and crops—was "a national interest of very nearly the first magnitude" that could "be protected only by national action in concert with that of another power"; "[i]t [was] not sufficient to rely upon the States." *Id.* at 435. Moreover, the Act did not upset the Constitution's balance of powers between the States and Federal Government because the Tenth Amendment did not generally prevent Congress from implementing a treaty in this way. *See id.* at 434. Thus, *Holland* stands for the principle that Congress has authority, under the Necessary and Proper Clause, to pass legislation that implements a non-self-executing treaty, and the States cannot rely on the Tenth Amendment to avoid being subject to that law when the object of the treaty promotes a national interest that can be protected only by action between sovereign nations.

Several federal courts have read *Holland* to mean the Necessary and Proper Clause also governs whether a statute is in fact "implementing legislation," and implementing legislation is automatically constitutional if it implements a valid treaty. Those courts have imported the "rational relationship" test used in other Necessary and Proper Clause cases, *see, e.g.*, *United States v. Comstock*, 560 U.S. 126, 134 (2010), to inquire whether the statute at issue constitutes a means that is rationally related to implementation of a particular treaty to determine whether it "implements" that treaty, *e.g.*, *United States v. Frank*, 486 F. Supp. 2d 1353, 1355–59 (S.D. Fla. 2007), *aff'd on other grounds*, 599 F.3d 1221 (11th Cir. 2010). Under this line of reasoning, Congress need not reference the treaty directly or explicitly discuss the treaty in the statute's

legislative history for the court to conclude the statute implements the treaty.  Instead, the courts are satisfied that a statute and treaty are "rationally related" if the statutory language parrots or tracks the language of the treaty, *e.g.*, *United States v. Bond*, 681 F.3d 149, 167 (3d Cir. 2012), *rev'd*, 134 S. Ct. 2077; *United States v. Belfast*, 611 F.3d 783, 804–06 (11th Cir. 2010), or the statute and treaty express the same general purpose, *e.g.*, *United States v. Bollinger*, 966 F. Supp. 2d 568, 575 (W.D.N.C. 2013), *aff'd on other grounds*, 798 F.3d 201; *United States v. Flath*, No. 11-69, 2011 WL 6299941, at *9 (E.D. Wis. Sept. 14, 2011), *adopted in part by* 845 F. Supp. 2d 251 (E.D. Wis. 2012).  If the court concludes the statute is "rationally related" to the treaty, then the statute constitutes "implementing legislation."  Importantly, with citation to *Holland*'s statement that Congress has authority under the Necessary and Proper Clause to pass implementing legislation, generally, these courts conclude that if the treaty is valid, then the "implementing legislation" automatically is constitutional.  *See United States v. Lue*, 134 F.3d 79, 84 (2d Cir. 1998); *Frank*, 486 F. Supp. 2d at 1356.

That analysis reads *Holland* too broadly.  First, *Holland* does not speak to how to determine whether Congress has enacted a piece of legislation to implement a non-self-executing treaty, let alone direct the lower federal courts to apply the Necessary and Proper Clause's "rational relationship" test to make that determination.  There was no doubt in *Holland* whether Congress intended the Migratory Bird Treaty Act of 1918 to implement the non-self-executing treaty between Great Britain and the United States—indeed, the Court noted that it was "entitled an act to give effect to the convention."  252 U.S. at 431.  Consequently, *Holland* does not speak to how the courts should determine whether an act of Congress *implements* a treaty when the act itself is silent on that topic.  Second, *Holland* does not stand for the proposition that every piece of implementing legislation is constitutional so long as the treaty it implements is valid.  If that were

the case, then the Court would have had no reason to address the facts of the case before it except to say that the Migratory Bird Treaty Act of 1918 was constitutional because it implemented a valid treaty between Great Britain and the United States. Instead, the *Holland* Court held that the Migratory Bird Treaty Act of 1918 was necessary to remedy the harm the treaty had identified and the United States had agreed to remedy, as well as a proper means of doing so, because it did not tread on rights reserved to the States under the Tenth Amendment. *See id.* at 435. The Necessary and Proper Clause, then, is the source of Congress' power to enact implementing legislation, generally, and its outer bounds limit Congress' authority to pass such legislation. *Cf. id.* at 433, 435.

In short, *Holland* makes clear that Congress has authority to pass implementing legislation, but does not speak to how to determine whether a particular statute implements a certain non-self-executing treaty. It does, however, direct courts to analyze implementing legislation under the Necessary and Proper Clause to determine whether such legislation is within the realm of Congress' constitutional authority. The Necessary and Proper Clause allows Congress to construct laws that are "rationally related" to the implementation of another constitutionally enumerated power—here, the President's power to make and execute treaties. *See Comstock*, 560 U.S. at 134; *Holland*, 252 U.S. at 430–31. A statute is "necessary" to the implementation of a treaty if it is "plainly adapted to" the treaty, and the statute is a "proper" means of doing so if it is both "not prohibited" by the Constitution and "consistent with the letter and spirit of the Constitution." *See McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 421 (1819); *accord Comstock*, 560 U.S. at 134.

With these principles in mind, the court now turns to Section 2423(c), as defined in Count Two of the Superseding Indictment, and the Optional Protocol.

b.    Whether Section 2423(c) is a Constitutional Exercise of Congress'
Authority to Implement the Optional Protocol

The Government contends that Congress intended Section 2423(c), originally and as amended to reach the conduct alleged in Count Two, to implement the Optional Protocol, a non-self-executing treaty that requires implementing legislation to become domestic law in the United States.  *See* S. EXEC. RPT. NO. 107-4, at 15 (2002); Gov't's Surreply, ECF No. 37, at 12 (cross-referencing Gov't's Opp'n, ECF No. 25, at 20–30).  For the reasons that follow, the court disagrees.

The Optional Protocol calls on States Parties to create and enforce laws that prohibit the exploitation of children for commercial gain.  The very first Article of the treaty makes plain the States Parties' obligation to "prohibit the sale of children, child prostitution and child pornography."  OPTIONAL PROTOCOL art. 1.  The second Article defines those three terms expressly.  "Sale of children" refers to "any act or transaction whereby a child is transferred by any person or group of persons to another for remuneration or any other consideration." *Id.* art. 2(a).  Next, "[c]hild prostitution" is defined to mean "the use of a child in sexual activities for remuneration or any other form of consideration."  *Id.* art. 2(b).  Lastly, the treaty makes clear that "[c]hild pornography means any representation, by whatever means, of a child engaged in real or simulated explicit sexual activities or any representation of the sexual parts of a child for primarily sexual purposes."  *Id.* art. 2(c).  The third Article in the Optional Protocol makes it incumbent on the States Parties to ensure that certain enumerated offenses or the attempt of those offenses, whether committed abroad or at home, are covered by the States Parties' laws.  *See id.* art. 3.  Those offenses are: (1) "[t]he offering, delivering or accepting, by whatever means, of a child for the purpose of" sexual exploitation, organ transfers for profit, or forced labor; (2) "[i]mproperly inducing consent, as an intermediary, for the adoption of a child"; (3) "[o]ffering, obtaining, procuring or providing a child for child prostitution"; or (4) "[p]roducing, distributing,

disseminating, importing, exporting, offering, selling or possessing for the above purposes child pornography." *Id.* Lastly, of relevance here, the Optional Protocol obligates States Parties to "adopt or strengthen, implement and disseminate, laws, administrative measures, social policies and programmes to prevent the offences referred to" therein. *Id.* art. 9(1).

The court accepts, for the sake of argument, that Congress passed Section 2423(c), as applied to the conduct alleged in Count Two, to implement the Optional Protocol but concludes that it was an overreach of Congress' authority under the Necessary and Proper Clause to do so. Section 2423(c), as defined to criminalize an American citizen's act of molesting his child while he resides in the Philippines, is neither a "necessary" nor "proper" means of implementing the Optional Protocol.

Section 2423(c)'s criminalization of noncommercial sexual abuse of one's own child by an American residing in a foreign country is not "necessary" because the conduct it prohibits is not plainly adapted to implementing the stated goals of the Optional Protocol and does not require multiple nations' involvement to prevent. The Optional Protocol's text makes plain its goal: bringing together multiple nations to eliminate the worldwide market in child trafficking and sex tourism. Articles 1, 2, and 3 focus on the commercial exploitation of children and direct States Parties to put in place criminal laws that address three of the most prevalent means of harming children for commercial gain: sale, prostitution, and pornography. *See* Optional Protocol arts. 1, 2, 3. As already discussed, however, Section 2423(c)—as applied to Defendant's alleged molestation and attempted molestation of his daughter—criminalizes wholly local activity that is not only itself noncommercial in nature but also disconnected from any broader market. *Supra*, at 28–32. As charged, Count Two does not involve the sale of children, child prostitution, or child pornography. Prosecuting an American residing abroad who molests his own child for no

commercial purpose brings the States Parties to the Optional Protocol no closer to eliminating the market in child trafficking and sex tourism. Additionally, the harm the Optional Protocol has identified—the existence of a market for sex with children—indisputably requires multiple participants to remedy because it is a "subject matter [that] is only transitorily within the State and has no permanent habitat therein." *See Holland*, 252 U.S. at 435. In contrast, the prosecution of individual American citizens residing abroad who molest children without remuneration is a matter that can be handled entirely by local law enforcement. Consequently, using Section 2423(c) to prosecute Defendant's act of sexually abusing his daughter while he resided in the Philippines does not bear a rational relationship to the Optional Protocol.

Correlatively, when defined to reach Defendant's alleged act of noncommercial sexual abuse of his daughter, Section 2423(c) also is not a "proper" exercise of Congress' authority under the Necessary and Proper Clause to implement a treaty because it upsets the balance of constitutional powers. The Supreme Court has interpreted the Necessary and Proper Clause to permit Congress to implement an existing, non-self-executing treaty, as negotiated by the President. *See* U.S. CONST. art. II, § 2, cl. 2; *Holland*, 252 U.S. 416. It would violate the structure and spirit of the Constitution for Congress to pass implementing legislation that causes the treaty to take on a shape that contradicts the Constitution, either by causing the treaty to reach a topic on which the President himself could not have negotiated or by allowing Congress to reserve for itself power to expand the treaty's scope beyond what the President negotiated on the country's behalf. Section 2423(c), as applied to the conduct alleged in Count Two, threatens to do both.

First, allowing Section 2423(c) to stand as implementing the Optional Protocol risks construing the treaty to reach a topic on which the President may lack authority to negotiate: domestic matters of another country. The Supreme Court has intimated that the Treaty Power

reaches only "proper subjects of negotiation between our government and other nations." *Asakura v. City of Seattle*, 265 U.S. 332, 341 (1924); *accord Bond*, 134 S. Ct. at 2102–11 (Thomas, J., concurring) (joined by Justices Scalia and Alito); *In re Ross*, 140 U.S. 453, 463 (1891); *Geofroy v. Riggs*, 133 U.S. 258, 266 (1890). In particular, "[n]o court has ever said . . . that the treaty power can be exercised without limit to affect matters which are of purely domestic concern and do not pertain to our relations with other nations." *Power Auth. of N.Y. v. Fed. Power Comm'n*, 247 F.2d 538, 542–43 (D.C. Cir.) (internal quotation marks omitted), *vacated as moot*, *Am. Pub. Power Ass'n v. Power Auth. of N.Y.*, 355 U.S. 64 (1957) (per curiam). Indeed, in rejecting such a broad construction, Justice Thomas recently wrote that "to interpret the Treaty Power as extending to every conceivable domestic subject matter—even matters without any nexus to foreign relations— would destroy the basic constitutional distinction between domestic and foreign powers." *Bond*, 134 S. Ct. at 2103 (Thomas, J., concurring) (joined by Justices Scalia and Alito). Accepting that there is some limitation on the President's Treaty Power, it follows that the Necessary and Proper Clause, which only grants Congress power to assist the President in his treaty-making powers, cannot provide Congress with authority to assist the President in *exceeding* his treaty-making powers. The Optional Protocol demands that States Parties criminalize a certain set of offenses pertaining to the sale of children, child prostitution, and child pornography, as well as authorizes States Parties to pass additional laws on those topics aimed at better effectuating the treaty's goal of eliminating the market for child trafficking and sex tourism. *See* OPTIONAL PROTOCOL arts. 1, 3, 9. In contrast, Section 2423(c), as applied to the conduct in Count Two, criminalizes local sexual offenses, divorced from commerce or commercial implications, while residing abroad. Allowing such a statutory provision to stand as legislation that implements the Optional Protocol would transform the scope of the treaty to reach a matter of domestic concern—the purely local,

noncommercial sexual abuse of a minor—which is a topic on which the President arguably lacks authority to negotiate. *See Bond*, 134 S. Ct. at 2109 (Thomas, J., concurring) ("Nothing in our cases . . . suggests that the Treaty Power conceals a police power over domestic affairs."); *Power Auth. of N.Y.*, 247 F.2d at 542–43.

Second, treating Section 2423(c) as implementing legislation would essentially permit Congress to reserve for itself a portion of the Treaty Power by allowing it to expand the scope of the Optional Protocol to regulate conduct the treaty neither demands nor authorizes and which Congress lacks independent power to regulate. It is axiomatic that Congress cannot "reach beyond the natural limit of its authority and draw within its . . . scope" a power reserved to another branch. *See Nat'l Fed'n of Indep. Bus.*, 567 U.S. at 561 (Roberts, C.J.); *cf. Bond*, 134 S. Ct. at 2101 (Scalia, J., concurring). The Constitution exclusively affords the President the role of negotiating and entering into treaties on the United States' behalf; Congress does not get to decide the topic of a treaty, and Congress can only *limit* the scope of a treaty by making a reservation before ratification. To allow Congress to pass "implementing legislation" that the treaty neither expressly nor implicitly authorizes would be to give Congress a portion of the President's authority under Article II in the form of a treaty-editing power, allowing it to *expand* the scope of a treaty. The Necessary and Proper Clause does not grant Congress such power. If the President negotiates and enters into a non-self-executing treaty that demands or authorizes regulation of conduct Congress could not otherwise regulate, then Congress may rely on its Necessary and Proper Clause powers to pass implementing legislation to reach that conduct. *See Holland*, 252 U.S. at 432–33 (explaining that Congress may pass legislation to implement a treaty that it could not otherwise pass). But Congress cannot rely on the Necessary and Proper Clause to enact legislation absent a supporting enumerated power *and* which the treaty does not demand or authorize Congress to reach. As

discussed earlier, the Government does not seriously dispute that Congress lacks constitutional authority to criminalize the act of residing in one of the United States and molesting one's own child, and the court concludes the Optional Protocol does not demand or authorize States Parties to criminalize that conduct.[12]  Consequently, to allow Section 2423(c) to exist as "implementing legislation" in this case would be to let Congress edit the Optional Protocol to provide itself with authority to criminalize Defendant's alleged act of abusing his daughter.

In sum, Section 2423(c), as applied to the conduct alleged in Count Two, is not a "proper" exercise of Congress' authority because it either would cause the Optional Protocol to encompass a topic on which the President lacked authority to negotiate or allow Congress to reserve for itself the power to edit the substance of the treaty to reach topics not contemplated by the President. Viewed either way, Section 2423(c)'s noncommercial application unhinges the balance of powers carefully crafted by the Framers.  This the Constitution cannot permit.

Thus, Section 2423(c), as applied to the conduct alleged in Count Two, exceeds Congress' authority under the Necessary and Proper Clause.[13]

## D.    Venue

Defendant also moves to dismiss both counts of the Superseding Indictment on the ground that venue in the District of Columbia is not proper.  *See* Def.'s Mot. to Dismiss, ECF No. 19, at

---

[12] Article 3's use of the phrase "at a minimum" arguably authorizes States Parties to pass laws in furtherance of the treaty's objectives that are broader than those outlined in Article 3.  OPTIONAL PROTOCOL art. 3(1); *see* Gov't's Opp'n, ECF No. 25, at 22–23.  Similarly, the treaty's preamble urges States Parties to "adopt[] a holistic approach" facilitating "the elimination of the sale of children, child prostitution and child pornography" by "addressing . . . irresponsible adult sexual behaviour."  OPTIONAL PROTOCOL pmbl.  However, that "authorizing" language must be construed in light of the Optional Protocol's stated purpose: the international problem of commercial exploitation of children, either by their sale or prostitution, or the creation and dissemination of pornography.  *See id.* pmbl., arts. 1, 3.  Though Defendant's alleged act of assaulting his daughter, without any connection to commerce, is "irresponsible adult sexual behavior," its prosecution through Section 2423(c)'s noncommercial definition is of no help in eliminating the *commercial* exploitation of children.  Consequently, the Optional Protocol does not authorize Congress to pass Section 2423(c) at least insofar as that provision is applied to reach Defendant's conduct.

[13] The court also holds that Section 2423(e), as applied to Defendant, is unconstitutional.  Defendant cannot be prosecuted for attempting to commit a crime the court has deemed to be beyond Congress' power to create.

13; Def.'s Reply, ECF No. 29, at 19–21.  As the court already has dismissed Count Two, it addresses the question of venue only as to Count One.

Section 2423 does not contain an express venue provision, so the Government must establish venue under another statutory provision.  The parties point to two venue statutes in particular:  18 U.S.C. § 3237(a) and 18 U.S.C. § 3238.  Section 3237(a) provides that, "[e]xcept as otherwise expressly provided by enactment of Congress, any offense against the United States begun in one district and completed in another, or committed in more than one district, may be inquired of and prosecuted in any district in which such offense was begun, continued, or completed," and defines crimes involving foreign commerce as continuing offenses subject to that provision.  18 U.S.C. § 3237(a).  Section 3238 states, as relevant here, that "an indictment or information may be filed in the district of the last known residence of the offender . . . , or if no such residence is known the indictment or information may be filed in the District of Columbia," for any offenses committed "out of the jurisdiction of any particular State or district."  18 U.S.C. § 3238.

The parties disagree as to whether the Government is required to establish venue under Section 3237(a) and, if not, whether the Government has met its burden of proof to establish venue under Section 3238.  Defendant contends that the proper venue for Count One must be governed by Section 3237(a) because he is charged with an offense involving traveling from the United States to the Philippines, and the Federal Rules of Criminal Procedures direct the Government to "prosecute an offense in a district where the offense was committed"—i.e., Hartford or Minneapolis.  *See* Fed. R. Crim. P. 18; Def.'s Mot. to Dismiss, ECF No. 29, at 19; Hr'g Tr. (draft), June 15, 2017, at 46.  Even if the Government is not required to establish venue under Section 3237(a), Defendant submits that he should have been indicted in the jurisdiction of his "last known

44

residence," pursuant to Section 3238, which is not the District of Columbia and which the Government should have known because he is a United States citizen and former member of the United States military. *See* Def.'s Mot. to Dismiss, ECF No. 29, at 19–20; Hr'g Tr. (draft), June 15, 2017, at 44, 57–58.

The court concludes that the Government may establish venue under either Section 3237(a) or Section 3238 for Count One. Neither Section 3237(a) nor Section 3238 sets forth an exclusive means of establishing venue for an offense—like the one charged in Count One—that allegedly occurs abroad, in part. Section 3237(a) speaks in permissive language, and Rule 18 of the Federal Rules of Criminal Procedure only requires the Government to prosecute an offense in the district where it was committed absent a statute permitting otherwise. *See* 18 U.S.C. § 3237(a) (stating that continuing offenses "*may* be inquired of and prosecuted in any district" in which they occur (emphasis added)); Fed. R. Crim. P. 18 ("*Unless a statute or these rules permit otherwise*, the government must prosecute an offense in a district where the offense was committed . . . ." (emphasis added)). Accordingly, the Government may establish venue under either Section 3237(a) *or* Section 3238 as to Count One.

The Government asserts venue is proper under Section 3238, but there remains a jury question as to whether the Government knew Defendant's last residence at the time it filed the original Indictment. "Venue is a jury question . . . if the defendant objects to venue prior to or at the close of the prosecution's case-in-chief, there is a genuine issue of material fact with regard to proper venue, and the defendant timely requests a jury instruction." *United States v. Nwoye*, 663 F.3d 460, 466 (D.C. Cir. 2011) (internal quotation marks omitted). Here, Defendant has objected to venue well in advance of trial; whether a "last known address" existed at the time the Government filed the original Indictment is a material question of fact that goes to venue; and

Defendant has requested a jury instruction concerning this issue. *See id.*; Hr'g Tr. (draft), June 15, 2017, at 43, 46, 50–51, 56–57. Accordingly, whether venue in the District of Columbia is proper as to Count One rests on a jury determination.

The court therefore rejects Defendant's argument that Count One of the Superseding Indictment should be dismissed based on improper venue.

## III.    CONCLUSION AND ORDER

The court shares Congress' disgust at the conduct it aimed to punish and eliminate through Section 2423(c), but that fact does not make Section 2423(c) constitutional in all its applications. Today's holding, however, should not be construed as anything other than limited: the statute is unconstitutional only as applied to this defendant and the factual allegations underlying Count Two of the Superseding Indictment. The court does not address Defendant's broader facial challenge to Section 2423(c).

In light of the foregoing discussion, the court grants in part and denies in part Defendant's motions to dismiss the Superseding Indictment and denies as moot his motion for severance. The court hereby orders trial to proceed on August 14, 2017, only as to Count One of the Superseding Indictment. Count Two of the Superseding Indictment is dismissed.

Dated:  July 27, 2017                                  Amit P. Mehta
                                                       United States District Judge